**UNITED STATES of America**

v.

**Joe FEDROFF.**

**Appeal of Joseph FEDROFF.**

**No. 88–5714.**

United States Court of Appeals, Third Circuit.

Argued Feb. 2, 1989.

Decided May 11, 1989.

Rehearing Denied July 10, 1989.

---

John F. McMahon (argued), Federal Public Defender, Dist. of N.J., Newark, N.J., for appellant.

Edna Ball Axelrod, Daniel Gibbons (argued), Chief, Appeals Div., U.S. Attorney's Office, Newark, N.J., for appellee.

Before HUTCHINSON, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Joseph Fedroff appeals his convictions for mail fraud, extortion, and accepting kickbacks. The issue raised by this appeal is whether the defendant is entitled to a new trial in light of *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed. 2d 54 (1988). Because we find that the defendant is entitled to a jury instruction on entrapment, we will vacate the convictions and remand for a new trial.

### I.

In 1985, the Federal Bureau of Investigation commenced an investigation into payoffs to public works officials in New Jersey. Columbian Steel Company, Inc. ("Columbian Steel"), a municipal supply firm, had been identified as a source of kickbacks. Based on this information, the FBI compiled a list of affected municipalities, which included North Arlington, New Jersey. Special Agent Edward Dustman was assigned to pose as a Columbian Steel salesman to solicit contracts from municipal employees and to offer kickbacks.

Dustman proceeded to contact employees of North Arlington's Department of Public Works. His first business dealings were with a mechanic, Philip Uchrin. In return for Uchrin's orders with Columbian Steel, Dustman paid him certain kickbacks. After several payments, Dustman learned that Uchrin was planning to discard certain tire chains owned by the municipality. Dustman offered to sell the tire chains and divide the proceeds. According to Dust-

man, they agreed that the sale proceeds would be split between Uchrin, Dustman, and Uchrin's superior, defendant Joseph Fedroff, Acting Superintendent of Public Works. Dustman never spoke to Fedroff about the sale of tire chains, but testified that Uchrin mentioned that Fedroff was aware of the transaction. Fedroff had been hired by the North Arlington Department of Public Works in February, 1985 as a repairman, and was promoted to acting superintendent in September, 1985.

On February 20, 1986, Dustman met Joseph Fedroff for the first time at a local bar, where he paid Fedroff $65 as his share of the proceeds from the fictitious tire chain sale. Dustman told Fedroff that if he "came up with something else," to let him know. Upon leaving the bar, Dustman handed Fedroff another $100 in an envelope, saying that it was in appreciation for the business that Fedroff had provided to Columbian Steel.

On February 27, 1986, Dustman met Fedroff at a diner. Dustman gave Fedroff $60, representing his share of money from a second fictitious sale of tire chains. Dustman suggested that Fedroff introduce him to other municipal officials with whom he could do business. Dustman told Fedroff that he would be given a finder's fee. Fedroff said he would talk to a purchasing agent at the Board of Education to "find out who ... he buys from."

Dustman and Fedroff next met on April 9, 1986, again at a local bar. Dustman told Fedroff that he had purchased 20% of Columbian Steel, and that he would be splitting his sales territory with a new salesman. At the end of their conversation, Dustman handed Fedroff $100, stating, "Here's a hundred bucks many thanks Joe.... We appreciate your business you guys are super O.K." Dustman again mentioned Fedroff's county contacts, to which Fedroff responded that they "could work something out."

The next contact took place on June 5, 1986 at a local diner. Dustman introduced

Fedroff to Special Agent John Lewis, who was to replace Dustman as the "salesman" for Columbian Steel.[1] Dustman described Lewis as a person who would "do business whatever way he can," who understood what was happening, and who was "blending in very nice." At the meeting, Dustman gave Fedroff $50, saying that it was in appreciation for an order that Fedroff had placed with Columbian Steel.

On August 5, 28, and October 1, 1986, Fedroff again met with Lewis. On these three occasions, Fedroff accepted cash payments from Lewis totalling $235. Lewis explained to Fedroff that the payments constituted a percentage of the business Fedroff had provided for Columbian Steel. On October 21, 1986, Lewis bought Fedroff lunch at an expensive restaurant. They discussed the kickback scheme, but no money changed hands. One month later, on November 21, 1986, Fedroff and his wife attended the 1986 League of Municipalities Convention in Atlantic City. Lewis paid for their condominium rental and a $350 dinner, had them chauffeured in a government rented limousine, and hosted a night of gambling at the Trump Castle and Casino. Before he checked out of the condominium, Fedroff accepted $450 cash from Lewis.

## II.

Fedroff was indicted on October 30, 1987, and charged with mail fraud (18 U.S.C. § 1341, 2), extortion (18 U.S.C. § 1951), and accepting kickbacks (18 U.S.C. § 666(b)). He was found guilty on all counts.

After the jury verdict but before the imposition of sentence, the United States Supreme Court decided *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed. 2d 54 (1988). The Court held that a defendant may deny one or more elements of a crime and still be entitled to the defense of entrapment. Based on this decision, defendant moved for a new trial.

---

1. Lewis also posed as a salesman for another municipal supply firm, Capital Highway & Materials, Inc.

The trial court denied Fedroff's motion. After reviewing the evidence presented at trial, the court found that the defendant accepted, "without oppressive inducement, regular and systematic payoffs as part of an ongoing business relationship." According to the court, the defendant "palpably failed to adduce sufficient evidence of indisposition, [and therefore] *Mathews* does not require the windfall of a new trial."

Fedroff was sentenced to thirty days imprisonment on the mail fraud count, and to a suspended sentence and three years probation on the extortion and kickbacks counts. In addition, he was ordered to make restitution, submit to alcohol rehabilitation, and perform 300 hours of community service. This appeal followed.

## III.

Before the Supreme Court's decision in *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the prevailing law in this circuit required the defendant to admit the elements of the crime before he was entitled to an entrapment defense. *See, e.g. United States v. Hill*, 655 F.2d 512, 514 (3d Cir.1981). In *Mathews*, the Court held that "even if the defendant denied one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." 108 S.Ct. at 886. Based on *Mathews*, Fedroff moved for a new trial on the grounds that he was improperly denied an entrapment instruction because he denied the crimes charged.

■ Entrapment is a "relatively limited defense" that may defeat a prosecution only "when the Government's deception actually implants the criminal design in the mind of the defendant." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973); *see also Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) ("[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal"); *Sorrells v. United States*, 287 U.S. 435,

442, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932) (entrapment may occur when government officials "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute"). The defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Mathews*, 108 S.Ct. at 886. In the final analysis, each element of an entrapment defense may be viewed in relation to its counterpart. *See id.* (elements of entrapment defense related); *e.g.*, *United States v. Hunt*, 749 F.2d 1078, 1085 n. 9 (4th Cir.1984) (where government agents have afforded the opportunity for the commission of the crime, "one's willingness to commit a crime would necessarily depend on the level of inducement offered and the circumstances created by government agents."), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985). The two elements are interdependent. Indeed, as we noted in *United States v. El–Gawli*, 837 F.2d 142 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 55, 102 L.Ed.2d 34 (1988), " '[e]ntrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the government's inducement.' " *Id.* at 145 (citing *United States v. Jannotti*, 673 F.2d 578, 597 (3d Cir.) (*Jannotti I*), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)); *see also United States v. Bocra*, 623 F.2d 281, 285 (3d Cir.) ("key to the successful establishment of an entrapment defense is proof that the defendant was not predisposed to commit the crime and that the criminal intent in fact originated with the Government"), *cert. denied*, 449 U.S. 875, 101 S.Ct. 217, 66 L.Ed.2d 96 (1980).

Although entrapment is generally a question for the jury, *Mathews*, 108 S.Ct. at 886, the trial court will not instruct on entrapment unless the defendant has produced sufficient evidence on both prongs of the defense, *United States v. Armocida*, 515 F.2d 49, 55 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

The trial court must evaluate the quantum of evidence presented on each element to determine whether an entrapment instruction is warranted as a matter of law. *E.g., United States v. Busby,* 780 F.2d 804, 806 (9th Cir.1986); *United States v. Ortiz,* 804 F.2d 1161, 1164 (10th Cir.1986) (whether there is sufficient evidence to constitute a triable issue of entrapment is question of law).

In this case, the trial court concluded that the defendant produced insufficient evidence of entrapment to have required a jury charge on the defense, and therefore denied the defendant's motion for a new trial. Whether Fedroff was improperly denied an entrapment instruction is a question of law and thus subject to plenary review. *United States v. Adams,* 759 F.2d 1099, 1106 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *see also Honeywell, Inc. v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 655 (3d Cir.1988) ("We review the district court's ruling on a new trial motion only for abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case our review is plenary."), *cert. denied,* —— U.S. ——, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989).

The trial court properly considered the effect of *Mathews* in its decision denying Fedroff's motion for a new trial. *See Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (new rule for the conduct of criminal prosecutions is to be applied to all cases, state or federal, pending on direct review or not yet final). Similarly, we will apply *Mathews* to this appeal. Our review of the effect of *Mathews* is also a question of law subject to plenary review. *United States v. Pervez,* 871 F.2d 310, 314 (3d Cir.1989).

## IV.

Fedroff's argument on appeal is twofold. First, he argues that he did proffer suffi-
cient evidence of entrapment to have warranted a jury instruction, and therefore he is entitled to a new trial. Second, he claims that, because of the trial court's ruling on entrapment on the second day of trial, he was precluded from introducing critical evidence of non-predisposition and inducement. A new trial, he asserts, would give him the opportunity to present additional evidence of entrapment to a jury.

## A.

As we have explained, the defendant must produce evidence of both non-predisposition and inducement before the trial court may give an entrapment instruction. The element of non-predisposition to commit the offense is the primary focus of an entrapment defense. *Jannotti I,* 673 F.2d at 597 (citing *Russell,* 411 U.S. at 429, 93 S.Ct. at 1641–42); *United States v. Jannotti,* 729 F.2d 213, 224 (3d Cir.) (*Jannotti II*), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *see also Mathews,* 108 S.Ct. at 886 (predisposition is principal element in entrapment defense). Predisposition has been described as a "nebulous concept." *Hunt,* 749 F.2d at 1085; *see also United States v. Kaminski,* 703 F.2d 1004, 1008 (7th Cir.1983) (no infallible means of divining a defendant's predisposition to commit a crime after the fact). In general, predisposition may be defined as the defendant's inclination to engage in the crime for which he was charged, *Ortiz,* 804 F.2d at 1165,[2] measured before his initial exposure to government agents, *United States v. Gambino,* 788 F.2d 938, 945 (3d Cir.), *cert. denied,* 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986); *United States v. Williams,* 705 F.2d 603, 618 & n. 9 (2d Cir.1983) (normally, predisposition refers to state of mind of defendant before government agents make any suggestion that he should commit crime), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983); *Kaminski,* 703 F.2d at 1008. In

---

**2.** *See also United States v. Jenrette,* 744 F.2d 817, 822 (D.C.Cir.1984) (defendant found predisposed when "he exhibits a 'state of mind which readily responds to the opportunity furnished by the [government] to commit [the crime].'")

(quoting *United States v. Burkley,* 591 F.2d 903, 916 (D.C.Cir.1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979)), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985).

*Gambino,* this Court, relying on the Second Circuit's formulation, enumerated three categories of evidence from which the government may discharge its burden of proof on the issue of predisposition:

> [T]he Government may prove propensity by showing (1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.

788 F.2d at 945 (citing *United States v. Viviano,* 437 F.2d 295, 299 (2d Cir.), *cert. denied,* 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971)). In *United States v. Reynoso–Ulloa,* 548 F.2d 1329 (9th Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978), the Ninth Circuit also identified factors relevant in determining predisposition:

> Among these are the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government. While none of the factors alone indicates either the presence or absence of predisposition, the more important factor ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement.

*Id.* at 1336 (footnotes omitted).

In this case, as we have noted, we must determine whether Fedroff produced sufficient evidence of non-predisposition to meet his threshold burden on that prong of the defense. We undertake this by looking to Fedroff's evidence that he was not inclined to commit the crimes charged before his exposure to government agents. Fedroff's prior conduct and character are relevant to the issue of predisposition. *See United States v. Keller,* 624 F.2d 1154, 1156 (3d Cir.1980) (citing *Sorrells,* 287 U.S. at 451, 53 S.Ct. at 216).

Fedroff contends that he proffered sufficient evidence on non-predisposition. His evidence relates primarily to his good reputation and lack of prior involvement in this kind of illegal activity. Fedroff introduced evidence purporting to show that the FBI's initial investigation failed to turn up any evidence of his involvement. This was corroborated by Dustman. Furthermore, the agents testified that Fedroff never requested money or benefits, suggesting, according to Fedroff, that he had no proclivity to accept kickbacks. In addition, two character witnesses testified on his behalf.

■ In rebuttal, the government contends that, while prior evidence of the same criminal activity may be admissible evidence on predisposition,[3] lack of prior criminal involvement is not, by itself, evidence of lack of predisposition. Even though the government cites, no authority for this assertion, we believe that generally, lack of prior illegal conduct alone will not satisfy the defendant's burden of production on non-predisposition. As the Ninth Circuit pointed out in *Reynoso–Ulloa,* however, the jury may consider the character or reputation of the defendant, including any prior record, in determining the defendant's state of mind or inclination before his initial exposure to government agents. 548 F.2d at 1336; *see also Sorrells,* 287 U.S. at 451, 53 S.Ct. at 216. The Ninth Circuit also noted that "none of the factors alone indicates either the presence or absence of predisposition." 548 F.2d at 1336. Fedroff's reputation evidence and lack of prior criminal activity may also be relevant with respect to the first two categories of evidence enumerated by the Second Circuit, and relied upon in *Gambino,* from which the government may discharge its burden of proof on the issue of predisposition: "(1)

---

**3.** *E.g., Gambino,* 788 F.2d at 945 (government may prove propensity by showing, *inter alia,* an existing course of criminal conduct similar to the crime for which the defendant is charged).

an existing course of criminal conduct similar to the crime for which the defendant is charged, [and] (2) an already formed design on the part of the accused to commit the crime for which he is charged...." *Gambino*, 788 F.2d at 945 (citing *Viviano*, 437 F.2d at 299).

■ The government also argues that Fedroff never expressed reluctance to accept the payments. In *Jannotti I*, the court placed primary emphasis on the defendants' lack of reluctance to accept the proffered bribes in deciding that the defendants were not entrapped as a matter of law.[4] 673 F.2d at 605. In this case, however, we must determine whether the quantum of entrapment evidence offered by Fedroff meets the threshold necessary to allow consideration by the jury, not whether the defendant was entrapped as a matter of law. *See Gambino*, 788 F.2d at 944. Although the defendant's reluctance to commit the offense is the most important factor in determining predisposition, *Jannotti I*, 673 F.2d at 604, it is not the only factor a jury may consider. Indeed, no factor alone indicates either the presence or absence of predisposition. *See Reynoso-Ulloa*, 548 F.2d at 1336. The jury may also consider Fedroff's evidence of good character, reputation and lack of prior illegal activity, as well as his evidence showing that the suggestion of illegal activity was made by government agents. *See id.* Moreover, we note that while the district court must evaluate the evidence on each prong of the defense to determine whether an entrapment instruction is warranted, in many cases, there may be an overlapping of evidence, *see Mathews*, 108 S.Ct. at 886 (elements of entrapment defense related).

Consequently, while we recognize that Fedroff's evidence of non-predisposition is not substantial, especially in light of the lack of evidence indicating his reluctance to accept kickbacks,[5] we hold that Fedroff satisfied his burden of production on the non-predisposition prong of the entrapment defense. A defendant is "entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews*, 108 S.Ct. at 886; *see United States v. El-Gawli*, 837 F.2d at 145 (to satisfy threshold, defendant must come forward with some evidence as to both inducement and non-predisposition). Our holding rests upon the settled proposition that once the defendant has met his burden of production, the "ultimate factual decision in an entrapment case must be left to the jury." [6] *Jannotti*, 673 F.2d at 606; *see also Mathews*, 108 S.Ct. at 886.

Fedroff also contends that he produced sufficient evidence on the inducement prong of the defense. Inducement by law enforcement officials may take many forms, "including persuasion, fraudulent representation, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship." *El-Gawli*, 837 F.2d at 149. We held in *United States v. Marino*, 868 F.2d 549 (3d Cir.1989), that evidence of mere solicitation, without more, will not satisfy the defendant's burden of production on inducement. *Id.* at 552. The record shows that Fedroff and his wife were "wined and dined" at restaurants and hotels in New Jersey. Agent Lewis treated Fedroff to expensive lunches and dinners, had the defendant chauffeured in a limousine, paid for his accommodations, and hosted a night of gambling in Atlantic City. Moreover, fed-

---

4. We emphasize that *Jannotti I* and *Gambino* were not cases that considered the sufficiency of the evidence to warrant an entrapment charge, but rather were cases that considered whether the defendants were entrapped as a matter of law. The latter determination, of course, requires a higher standard of proof. *See Gambino*, 788 F.2d at 944 (to be entrapped as matter of law, evidence must be undisputed that the defendant had no predisposition to commit the crimes with which he is charged, and was induced to do so only by the trickery, persuasion, or fraud of the government).

5. The *Reynoso-Ulloa* court was unable to find any case in which the defense of entrapment was successful where the defendant had not indicated reluctance to engage in criminal activity. 548 F.2d at 1336 n. 11.

6. In *Jannotti I*, this court pointed out: "In resolving the issue of predisposition, the jury must determine the defendant's subjective intent. Except in unusual cases, intent can be proven only through circumstantial evidence." 673 F.2d at 604.

eral agents paid for meals and drinks at the various taverns and diners that served as their meeting places. Indeed, the evidence reveals that the government's involvement in this case was substantial.

The government argues that Fedroff accepted most of the kickbacks before the expensive restaurant and casino trips. The dates set forth in the indictment support the government's assertion that much of the illegal activity occurred before Fedroff was "wined and dined" by federal agents on October 21 and the weekend of November 21, 1986 in Atlantic City. Fedroff had accepted eight cash payments totalling $610 before October 21, 1986.

It is necessary, therefore, to review the charges. Count One of the indictment charges Fedroff with mailing a letter containing a check from the Borough of North Arlington to Columbian Steel for the purpose of "executing a scheme or artifice to defraud ... on or about April 4, 1986," a date well in advance of either the October 21 luncheon or the November 21 Atlantic City trip. Count Two charges him with knowingly and willfully affecting and attempting to affect commerce by committing extortion under color of official right "from on or about February 20, 1986 to on or about November 21, 1986," which encompasses both the luncheon and the convention. Finally, Count Three charges Fedroff with soliciting, accepting and agreeing to accept cash kickbacks from Columbian Steel and its representatives "from on or about February 20, 1986 to on or about October 1, 1986," which includes neither of the critical dates. Thus, much of the government's efforts to curry favor occurred after the commission of the crimes charged in Counts One and Three. Were this the only evidence of governmental inducement, we would grant a new trial on Count Two only.

Nonetheless, the evidence also shows that when Fedroff and the government agents met at various taverns and diners, the agents purchased meals and drinks for him from the time of their first meeting. Moreover, the agents developed a friendly association with the defendant, inquiring about his family and business at their various meetings. Dustman testified that he wanted Fedroff to believe that he liked him. There was evidence that from the beginning, the government agents attempted to ingratiate themselves with the defendant. Dustman also testified that he made all the contacts with Fedroff, and that Fedroff never telephoned him. Finally, the agents suggested to Fedroff, a new acting supervisor at the North Arlington Department of Public Works, that the acceptance of kickbacks was a longstanding practice. In light of this, we decline to weigh the evidence, as would a jury, in terms of when the inducement took place, its intensity or its significance. While the question of whether sufficient evidence exists to present an entrapment defense to the jury is a legal one, *United States v. Bay*, 852 F.2d 702, 705 (3d Cir.1988), the ultimate question of entrapment is generally one for the jury and not for the court, *Mathews*, 108 S.Ct. at 886. Our review of the entire record leads us to conclude that, on the whole, Fedroff produced sufficient evidence of inducement on all counts to meet his threshold of proof. We will allow a jury to draw its own conclusions regarding the weight of that evidence.

■■■ There is another matter that we have considered. In its denial of the motion for a new trial, the district court found that the "evidence indicated that defendant accepted, without oppressive inducement, regular and systematic payoffs as part of an ongoing business relationship." "Oppressive inducement" is not the standard. In *Marino*, we held that the government's mere solicitation to commit a crime was insufficient evidence of inducement to warrant entrapment defense, although we noted that it may take other forms, including persuasion, fraudulent representation, coercive tactics, pleas based on need, sympathy, or friendship. 868 F.2d at 551–52 (citing *El–Gawli*, 837 F.2d at 149). But a defendant need not produce evidence of oppressive inducement. In light of the standard applied by the district court, we cannot be sure that Fedroff "obtain[ed] the benefit of the decision in *Mathews*." *Bay*,

852 F.2d at 705.[7] Because we are granting a new trial, we need not remand this matter to the district court for redetermination.

### B.

■ Finally, Fedroff asserts that the trial court's ruling on entrapment on the second day of trial precluded him from presenting additional evidence of entrapment. In particular, Fedroff claims that he would have presented the testimony of George Pezet, a salesman for the States Chemical Manufacturing Company, a municipal supply firm. According to Fedroff, Pezet would have testified that, in his normal dealings with Fedroff, Fedroff never asked for or received any type of payment as a kickback. At oral argument, Fedroff's counsel also asserted that but for the trial judge's ruling, he would have requested that the tape of the Atlantic City dinner be played in its entirety to show the government agent "ingratiating himself" with the defendant. Thus, Fedroff is able to cite specific evidence that he would have adduced but for the trial court's ruling on entrapment.

We encountered a similar situation in *United States v. Bay*, except that, in *Bay*, our independent review led us to conclude that insufficient evidence of entrapment had been adduced at trial to have warranted an entrapment jury charge. Although we could not be sure that additional evidence of entrapment existed, we found that, because of the trial court's ruling under the pre-*Mathews* rule, the defendant "may have been discouraged from putting evidence in the record which would have been sufficient to reach the jury on the entrapment defense." 852 F.2d at 705. We remanded to the district court for a determination of that issue at an evidentiary hearing. *Id.*

In *Bay*, we remanded for a hearing rather than for a new trial because by doing so, we could "ensure that [the defendant would] obtain the benefit of the decision in *Mathews* [without] giving him the windfall of a full new trial where *Mathews* does not require one." *Id.* at 705. In this case, however, we find that the evidence presented at trial was sufficient to have warranted an entrapment instruction. Moreover, we note that the defendant has identified specific evidence that he was precluded from introducing by the trial court based on its pre-*Mathews* ruling. Consequently, unlike in *Bay*, we are convinced that remand for a new trial in this case would not amount to a windfall.

### III.

Accordingly, we will reverse the trial court's denial of defendant's motion for a new trial, vacate defendant's convictions and remand for a new trial on all counts.

---

7. Shortly after it began its deliberations, the jury sent a note to the trial judge which read: "The question of entrapment has entered into our deliberation and we would like to inquire as to whether or not it has any bearing on the case." The jury's inquiry is not dispositive on the entrapment issue. A jury question like this cannot create a right to a jury charge on the defense. That right depends solely on the evidence adduced at trial. *Cf. United States v. Bagnell*, 679 F.2d 826, 834 (11th Cir.1982) (in case where defendant has failed to meet his burden of proof for entitlement to entrapment instruction, jury's note inquiring as to applicability of entrapment defense insufficient to have required entrapment instruction), *cert. denied*, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).